**HAGENS BERMAN SOBOL SHAPIRO LLP**
Robert B. Carey #011186
Leonard W. Aragon #020977
2425 East Camelback Road, Suite 650
Phoenix, Arizona 85016
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
E-Mail: rcarey@hbsslaw.com
        leonard@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-Mail: steve@hbsslaw.com

Interim Lead Class Counsel for Consolidated Plaintiffs

[Additional counsel listed on signature page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE LIFELOCK, INC., MARKETING AND SALES PRACTICES LITIGATION | MDL Docket Civ. No. 2:08-md-01977 ALL CASES |
| | **MASTER CONSOLIDATED COMPLAINT** |
| | (Assigned to Honorable Mary Murguia) |

I.      **INTRODUCTION**

1.      Plaintiffs submit this Master Complaint ("Complaint") against Defendant LifeLock, Inc. for themselves and all others similarly situated.

2.      This Complaint is purely an administrative device to streamline pleadings and motion practice, and is done solely for the convenience of the Court and the parties to aid in efficiency and economy.

3.      The Complaint shall not affect any substantive or legal rights and does not supplant or supersede any complaint subject to this Multidistrict Litigation ("MDL") proceeding.

4.      This Complaint does not merge the consolidated suits into a single cause or alter the rights of any part in any respect.  The filing of the Complaint shall have no affect on applicable choice of law principles or on the potential subsequent remand of any of the cases back to their respective transferor courts.  This Complaint is not intended to change the rights of the parties, nor to make those who are plaintiffs in one case plaintiffs in another.

5.      Plaintiffs make the allegations in the Complaint based upon their personal knowledge as to their own acts, and upon information and belief as to those acts not within their personal knowledge, as well as upon their respective attorneys' investigative efforts regarding Defendant's actions and misconduct.

6.      This Complaint is submitted pursuant to the Amended Scheduling Order issue by this Court on March 6, 2009.

## II.      NATURE OF THE ACTION

7.      This is a consumer class action arising out of LifeLock, Inc.'s ("LifeLock") false, misleading and fraudulent misstatements, and material omissions regarding its ability to protect consumers from identity theft.  Defendant's actions have injured thousands of individuals across the country by unlawfully inducing them to enter into contracts that violate federal law and do not provide the promised protections.

8.      LifeLock advertises itself as providing a proactive identity theft prevention service by stating that it provides a "proven solution" that can prevent identity theft before it happens, and promises to guarantee its services up to $1,000,000.00.

9.      LifeLock, however, misleads consumers as to the nature of its alleged "guarantee" and fails to inform consumers that its (1) $1,000,000.00 "guarantee" is virtually worthless because it is riddled with restrictions, waivers, and limitations, (2) LifeLock does not require entities extending credit to contact consumers to verify their

identity prior to extending new credit, (3) LifeLock cannot, by law, perform the services it promises to perform, (4) LifeLock's $1,000,000.00 guarantee is an insurance product that must comply with the Arizona Insurance Code, but LifeLock fails to even attempt to comply with the Insurance Code's rules and regulations, and (5) statements by LifeLock's CEO regarding the ability of LifeLock to protect his own identity are, at best, misleading because his identity was stolen while he was a LifeLock customer.

10. With over one million customers, each paying approximately ten dollars per month for their LifeLock "protection," LifeLock is earning around $120 million dollars a year in revenue (and this number was growing rapidly even prior to the company's recent, extensive advertising campaign) on the premise of misleading and deceptive claims and omissions about the effect of fraud alerts, the coverage LifeLock will provide in the event of an identity theft, and the legality of LifeLock's business practices.  As it is, approximately one million consumers pay over $100 per year thinking and believing that they have certain protections from theft and certain benefits in the event of a theft, when in fact they have neither.

11. LifeLock's conduct induced a contract with a promise of performance that is unlawful.  As such, LifeLock violates Arizona's Consumer Fraud Act, the Arizona Insurance Code, and committed negligent misrepresentation and breach of contract. Plaintiffs and class members have sustained damages as a result of LifeLock's false and misleading statements and material omissions, and are entitled to, among other things, rescission and punitive damages.

**III. THE PARTIES**

12. Plaintiff Byrl Lane is a resident of Arizona and subscriber, during all relevant times, to LifeLock.

13. Plaintiff Jason Sbalcio is a resident of New Jersey subscriber, during all relevant times, to LifeLock.

14. Plaintiff Franco Vega is a resident of Arizona and subscriber, during all relevant times, to LifeLock.

1921303.1

15.     Plaintiff Melvyn A. Blake is a resident of New Jersey and subscriber, during all relevant times, to LifeLock.

16.     Plaintiff Alva Tina Blake is a resident of New Jersey and subscriber, during all relevant times, to LifeLock.

17.     Defendant LifeLock is a Delaware corporation with its principal place of business at 60 East Rio Salado Parkway, Tempe, Arizona, 85281.

**IV.     JURISDICTION AND VENUE**

18.     This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005, which, *inter alia,* amends 28 U.S.C. § 1332 to add subsection (d), which confers federal jurisdiction over class actions where, as here, "any member of a class is a citizen of a State different from any other Defendant," and the aggregated amount in controversy exceeds five million dollars ($5,000,000).  *See* 28 U.S.C. § 1332(d)(2), (6).

19.     This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of the Court where Defendant has its principal place of business (Tempe, Arizona), and upon information and belief Defendant's conduct that gives rise to this complaint, as further described below, was created, ratified, and implemented from its corporate offices located in Tempe, Arizona.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1407 and 28 U.S.C. § 1391 because Defendant, as a corporation, is "deemed to reside in any judicial district in which [it is] subject to personal jurisdiction" and because the actions, misrepresentations and material omissions "giving rise to the claims[s] occurred" in this District.

**V.     FACTUAL ALLEGATIONS APPLICABLE TO ALL PARTIES**

**A.     Background**

21.     LifeLock, founded in 2005, claims on its website that it is "the industry leader in proactive identity theft protection," that it "offers a proven solution that prevents your identity from being stolen before it happens," and that it will "protect your identity

and personal information for only $10 a month - and we guarantee our service up to $1,000,000."

22.     LifeLock's advertisements feature Todd Davis, a founder of LifeLock, giving out his real social security number.  In its video advertisements, Todd Davis – who the advertisement indicates is the CEO of LifeLock – drives around in a van with his social security number painted on the side announcing his social security number over a loud speaker, while handing out sheets of paper with the social security number.  He states, "I'm Todd Davis, and I'm here to prove just how safe your identity can be with LifeLock.  That's my real social security number."  A voice-over announcer then states that "LifeLock helps keep your personal information safe, even in the wrong hands."  LifeLock's print advertisements similarly feature Todd Davis and his social security number.  In one, the text reads, "I'd be worried too – if I didn't have LifeLock."  Another, run in the New York Times, states, "The fact is another identity is stolen every three seconds, but I still put my personal information out there for the world to see because of my complete confidence in LifeLock's ability to protect my identity."

23.     Proving the falsity of LifeLock's claims, Davis' identity was stolen in 2006 while he was a LifeLock customer.  A Texas man secured a $500.00 payday loan using Davis' social security number.  Nevertheless, LifeLock continues to run advertisements claiming that Davis knows his identity is safe with LifeLock, without disclosing that his identity has in fact been stolen as a result of the disclosure.

24.     Nor does LifeLock disclose that the previous credit-related company of one of its founders, Robert J. Maynard, Jr., was investigated and prosecuted for fraud and misrepresentation by both the State of Arizona and the Federal Trade Commission.  As a result, the company was required by a judge to stop conducting business in Arizona, and the FTC banned Maynard for life from "advertising, promoting, offering for sale, selling, performing, or distributing any product or service relating to credit improvement services."  Although Maynard resigned as CEO of LifeLock following news reports detailing his past financial problems, including allegations that he stole his father's

1921303.1

identity, he continued to work with the company as a consultant.  LifeLock does not disclose to its customers its former CEO's conduct or his continued relationship to LifeLock.

**B.     Lifelock Is Not Permitted To Perform The Primary Service It Offers**

25.     LifeLock's purported "proven solution" consists of illegally placing and renewing fraud alerts under consumers' names with credit bureaus.  LifeLock, however, fails to inform consumers of the illegality of its actions and the scope and effectiveness of fraud alerts.

26.     Under the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681c-1(a), a credit reporting agency must place an initial 90-day fraud alert on the file of a consumer, "[u]pon the direct request of a consumer, or an individual acting on behalf of or as a personal representative of a consumer," where the consumer has a good faith suspicion that he or she is, or is about to be, the victim of a fraud or related crime, including identity theft.  The FCRA defines a "consumer" as an "individual," while the statute uses the term "person" to refer to individuals and entities.  *See* 15 U.S.C. §§ 1681a(b); 1681a(c).

27.     Under the statutory language, only an individual is allowed to place a fraud alert, either for themselves, or acting on behalf of or as a personal representative of another individual.  The statutory language intentionally excludes corporations such as LifeLock from placing fraud alerts.  As the legislative history states, the statute "use[s] the word 'individual' instead of 'person' to ensure that the provision would only apply to specific individuals such as a consumer's authorized family members or guardians (or attorneys acting as personal representatives), authorized representatives from bona fide military services organizations, ***and not to companies and entities such as credit repair clinics***."  *See* H.R. Rep. No. 108-263 at 40 (Sept. 4, 2003) (emphasis added).  Therefore, a company such as LifeLock cannot be a personal representative or act on behalf of a consumer for the purposes of placing a fraud alert under the FCRA.  Thus, LifeLock

1921303.1

cannot lawfully offer to perform, or actually perform the service it has provided under the contract, and its attempt to do so offends a public policy established by the FCRA.

### C.   A Federal Court Rules That LifeLock Violates Public Policy by Placing Fraud Alerts

28.    Plaintiffs' interpretation of the statute is supported by the Honorable Andrew J. Guilford's decision in the United States District Court, Central District of California, granting partial Summary Judgment in favor of a credit reporting agency, Experian Information Solutions, Inc., and against LifeLock.  *See* Attachment A, *Experian Information Solutions, Inc. v. LifeLock Inc.* (Case No. SACV08-00165 AG), Order Granting Motion for Partial Summary Judgment.

29.    Judge Guilford's Order states, "By using the term "consumer" rather than "person" in Section 1681c-1, Congress expressly excused Experian and other credit reporting agencies from placing fraud alerts requested by companies like LifeLock.  The Court finds that this is a proper interpretation of the plain meaning of the statute."  *See* Attachment A, pg. 4.

30.    In addition to the statute's plain language, Judge Guilford supported his ruling by pointing to the legislative history cited above:  "Under the clear terms of the legislative history, and request for a fraud alert 'must' be made by 'an individual,' and not by a company like LifeLock."  *Id.*, at pg. 5.

31.    Finally, Judge Guilford found that by "Taking Section 1681c-1 and its legislative history together, the Court finds that the FCRA embodies an established public policy against companies like LifeLock placing fraud alerts on behalf of consumers."  *Id.*

32.    In response to the Court's ruling, LifeLock's CEO, Todd Davis, stated that it left company officials "surprised and disturbed," but that "it's not changing our business today."  Indeed, LifeLock claims to continue to place fraud alerts with another credit reporting agency – TransUnion LLC – despite the fact that the placement of fraud alerts with any credit reporting agency violates public policy.

1921303.1

**D.      Lifelock Overstates The Efficacy Of Fraud Alerts In Stopping Identity Theft, And Fails To Disclose The Possible Consequences Of Placing Fraud Alerts In Your Credit Profile**

33.      Fraud alerts provide limited protection against only certain types of identity theft and fraud.  When a fraud alert is in place, it alerts creditors accessing the consumer's credit report that the consumer does not authorize the establishment of any new credit accounts, the issuance of an additional card on an existing credit account, or any increase in the credit limit on an existing credit account.  15 U.S.C. § 1681c-1(h)(1)(A).  A creditor using the credit report may only approve such transactions if the user "utilizes reasonable policies and procedures to form a reasonable belief that the user knows the identity of the person making the request."  If the consumer has provided a telephone number for verification purposes, the user of the report must either contact the consumer at that number *or* "take reasonable steps to verify the consumer's identity and confirm that the application for a new credit plan is not the result of identity theft."  15 U.S.C. § 1681c-1(h)(1)(B).  Fraud alerts do not protect consumers against identity theft involving the use of existing accounts, or the opening of accounts that do not require accessing a credit report – as in the theft of Davis' identity.

34.      However, in selling its purported protection scheme, LifeLock misrepresents the availability, purpose and scope of fraud alerts in several material ways, including:

a. failing to inform consumers that under the FCRA, a corporation such as *LifeLock cannot lawfully place fraud alerts* on the consumers' behalf;

b. failing to inform consumers that under the FCRA, an initial fraud alert may be placed by a consumer or an individual acting on their behalf *only* when the consumer has a good faith suspicion that the consumer is or is about to be the victim of a fraud or related crime, including identity theft;

c. implying that any of the reasons given on its website – such as the viewing of news reports or the desire to receive less junk mail – are valid reasons for requesting a fraud alert;

d. indicating that consumers are entitled to perpetually renew the 90-day fraud alert, in contradiction of the FCRA; and

1921303.1

e. stating that creditors will be required to call the consumer before opening a new line of credit, even though not all creditors will even know there is a fraud alert on file and even those who are aware of the alert may take other reasonable steps to verify the consumer's identity.

35.   LifeLock also assures consumers that, "Fraud alerts do not affect your creditworthiness or your credit rating, either in actuality or perception, and as long as you are reasonably available at the phone number listed in the alert, you should not lose the ability to apply for credit."  But perpetual renewal of fraud alerts can affect a consumer's creditworthiness and, upon information and belief, can actually reduce a consumer's credit score or cause lenders to consider the consumer a credit risk.  LifeLock fails to disclose these material facts to consumers.

36.   Likewise, consumers could lose their ability to apply for credit when they are unable to be reached at the phone number they provided or when vendors choose to turn down the application rather than complying with the requirements of a fraud alert. LifeLock fails to disclose these material facts to consumers.

37.   LifeLock's advertisements and promotions, individually and in the aggregate, misrepresent, among other things, that (1) LifeLock has the authority to lawfully place fraud alerts on behalf of consumers, (2) LifeLock possesses a special expertise or ability to place such alerts that consumers do not possess, (3) all consumers are entitled to such fraud alerts even if they do not have a good faith suspicion that they are about to be the victim of a fraud or related crime, (4) all consumers are entitled to perpetual renewal of such fraud alerts regardless of circumstances, (5) LifeLock's services in placing fraud alerts will effectively "lock" an individual's identity and protect them from identity theft, and (6) the perpetual renewal of fraud alerts will have no effect on the consumer's creditworthiness, credit rating or ability to secure credit.

38.   LifeLock further misleads customers by stating that part of its service consists of ordering credit reports for its members, without adequately disclosing to the consumer that (1) they have a right to obtain free credit reports once a year, (2) LifeLock

1921303.1

is charging the consumer to order the consumer's free credit reports, and (3) the consumer will not be able to access free credit reports once LifeLock has done so.

### E.   Lifelock Misrepresents The Scope Of Its Alleged $1,000,000.00 Guarantee

39.   LifeLock also misrepresents the scope of its alleged $1,000,000.00 guarantee, dramatically overstating the actual value of its services and its alleged guarantee.  In its commercials, Todd Davis is featured announcing to a crowd of individuals, "If anything happens for any reason while you're a client of LifeLock, *we will cover all losses and all expenses up to one million dollars*."  (emphasis added)  In response to Davis' statement, a man is featured asking, "You're going to protect me for one million dollars?"

40.   Similarly, LifeLock states on its website that: "If your Identity [sic] is misused while you are a member of LifeLock, we'll spend up to $1,000,000 to make it right."  It further states:

> If your Identity [sic] is stolen while you are a member of LifeLock, we're going to do whatever it takes to recover your good name.  If you need lawyers, we're going to hire the best we can find.  If you need investigators, accountants, case managers, whatever, they're yours.  *If you lose money as a result of the theft, we're going to give it back to you.*  We will do whatever it takes to help you recover your good name and we will spend up to $1,000,000 to do it.

(emphasis added).

41.   LifeLock has caused similar misrepresentations to be repeated elsewhere. For example, the website www.lifelockreviews.com, which repeatedly links to LifeLock's own website and offers discounts on LifeLock membership, states that LifeLock allows users to "be assured of up to $1 million guarantee against any losses from the loss of identify while being their client."

42.   However, the terms and conditions of the actual guarantee reveal that it provides much narrower protection than LifeLock advertises.  The Terms and Conditions state that LifeLock "will not be liable for any special, incidental, indirect or consequential

10

damages of any kind, nor any damages whatsoever other than as set forth in our Service Guarantee."

43.     The Service Guarantee, as contained in the Terms and Conditions, similarly disclaims such liability and has inconsistent terms concerning the scope of its coverage, stating:

> If you are our client when someone accesses your personal identifying information and subsequently uses it without your authorization to commit a fraud, due to a failure or defect in our Service, and you have complied with this Agreement, subject to the terms herein, we will pay professionals to assist in restoring any such loss or recover such expenses, as required, provided however that the maximum limit of our Service Guarantee is $1 (one) million per lifetime for all incidents in the aggregate. . . . .
> WE WILL PAY UP TO $1,000,000 TO CURE THE FAILURE OR DEFECT IN OUR SERVICE, PER CLIENT, PER LIFETIME FOR ALL INCIDENTS IN THE AGGREGATE, REGARDLESS OF CIRCUMSTANCE...WE WILL NOT MAKE PAYMENTS TO YOU FOR ANY LOSS YOU MAY INCUR. OTHER THAN OUR SERVICE GUARANTEE, AND EXCEPT AS OTHERWISE SET OUT HEREIN WE MAKE NO REPRESENTATION OR WARRANTY ABOUT OUR SERVICE OF ANY KIND, AND WE DISCLAIM ANY IMPLIED WARRANTIES OUTSIDE OF OUR SERVICE GUARANTEE, SUCH AS A WARRANTY OF MERCHANTABILITY OR FITNESS OF OUR SERVICE FOR ANY PARTICULAR PURPOSE.

44.     The Terms and Conditions and Service Guarantee contain inconsistent and confusing terms that are intended to mislead consumers and allow LifeLock to avoid fulfilling its promises.  By disclaiming all consequential damages, and stating that it will only pay money "to cure the failure or defect in our service," LifeLock intentionally informs consumers that LifeLock is not liable for anything beyond curing a defect in their service – which could only mean correcting a failure to properly place a fraud alert or remove the consumer from a junk mail list.  This language is intended to mislead and deter members from asking LifeLock to cover losses or pay for consequential damages such as hiring professionals to restore their losses, and to provide LifeLock with a basis for denying any such claims.

11

F.     **Lifelock's Alleged $1,000,000.00 Guarantee, Properly Construed, Is Insurance**

45.     Notwithstanding LifeLock's efforts to mislead consumers, deter claims and avoid liability through such provisions, the Service Guarantee, properly construed under Arizona law requires LifeLock to pay professionals to attempt to restore losses from an identity theft resulting from a failure or defect in LifeLock's services.  Under Arizona law, the Service Guarantee, therefore, provides coverage beyond the actual value of LifeLock's service and constitutes insurance against identity theft.

46.     Under the Arizona Insurance Code, an entity selling insurance is required, among other things, to submit its rates to the Department of Insurance for approval, sell its product using licensed insurance agents, and maintain adequate reserves to pay claims. Upon information and belief, LifeLock has not complied with these provisions, or even attempted to comply with any aspect of the Arizona Insurance Code.  In fact, LifeLock attempts to disclaim its responsibilities by stating that it is not an insurer in its Terms and Conditions, when in fact it is offering a form of insurance.  LifeLock undertakes by contract to indemnify its customers or to pay a specified amount upon determinable contingencies.

47.     Even properly construed to require LifeLock to pay professionals to attempt to restore losses from an identity theft, the Service Guarantee still provides far less coverage than LifeLock advertises.  The only conceivable time when the Guarantee would come into effect is when LifeLock failed to place the alerts or remove the consumer from lists, and the consumer can prove that the identity theft and the specific loss occurred as a result of that failure – a narrow set of circumstances that will not cover many potential identity thefts that could occur to a member of LifeLock.  For example, LifeLock's guarantee would not be triggered if a person's identity was stolen while a fraud alert was in effect, even though there are multiple situations in which that could happen – as the theft of Davis' identity aptly demonstrates.  This can happen because the creditor failed to fulfill its obligation to confirm the consumer's identity, the theft

12

1921303.1

involved accounts already in existence, or the theft involved establishing new accounts that do not require accessing a credit report.

48.     In addition, even when the Guarantee is triggered, LifeLock will not "do whatever it takes," "spend up to $1,000,000.00 to make it right," or "cover all losses and all expenses up to one million dollars," as promised in the advertising.  The Terms and Conditions expressly disclaim any "special, incidental, indirect or consequential damages," and the company will not directly repay losses and thefts that a victim of identity theft experiences.  Rather, at most, LifeLock would be required to hire professionals to attempt to recover or restore losses without actually covering the losses as promised on the website and in its advertisements.

49.     In addition, although LifeLock promises to hire "the best" lawyers, the Terms and Conditions give LifeLock sole discretion in choosing all professionals under the Service Guarantee.  Upon information and belief, LifeLock does not hire the best attorneys to represent members who have been victims of identity theft and are attempting to recover their losses.

50.     The false, misleading and fraudulent misstatements and omissions made by LifeLock were material to the contract and were an inducing cause for Plaintiffs entering into the contract.

## VI.     FACTUAL ALLEGATIONS RELATED TO INDIVIDUAL PLAINTIFFS

### A.     Byrl Lane

51.     Plaintiff Byrl Lane, an attorney, subscribed to LifeLock in October 2007. Since then, Mr. Lane has paid LifeLock ten dollars per month for each month of service. After his vehicle, which contained personal identification such as a driver's license, was stolen, Mr. Lane subscribed with LifeLock.  During his sign-up call with LifeLock, Mr. Lane was informed that he would be protected against any attempts to steal his identity or procure credit under his name using the information stolen from his truck.

1921303.1

52.     Based on LifeLock's advertisements and representations, Mr. Lane's impression was that LifeLock would, among other things, cover <u>any</u> type of loss related to the theft of his identity.

53.     Mr. Lane also understood, based on LifeLock's advertisements and representations, that LifeLock would require entities extending credit to contact him to verify his identity prior to extending new credit.  In accordance with this understanding, Mr. Lane submitted his personal information to LifeLock, including numbers at which he could be reached in the event of an attempted identity theft.

54.     Mr. Lane was not aware that LifeLock was not permitted to submit fraud alerts on his behalf and LifeLock did not advise him of this fact.

**B.      Jason Sbalcio**

55.     Plaintiff Jason Sbalcio subscribed to LifeLock for himself, his spouse and child for approximately five months in 2008.  During that time, Mr. Sbalcio paid LifeLock $20.25 per month for each month of service.  Mr. Sbalcio canceled his service in May 2008.

56.     Based on LifeLock's advertisement and representations, Mr. Sbalcio's impression was that LifeLcok would, among other things, cover <u>any</u> type of loss related to the theft of his identity.

57.     Mr. Sbalcio also understood, based on LifeLock's advertisements and representations, that LifeLock would require entities extending credit to contact him to verify his identity prior to extending new credit to those purporting to be him.  In accordance with this understanding, Mr. Sbalcio submitted his personal information to LifeLock, including numbers at which he was to be reached in the event of an attempted identity theft.

58.     Mr. Sbalcio was not aware that LifeLock was not permitted to submit fraud alerts on his behalf and LifeLock did not advise him of this fact.

1921303.1

**C.     Franco Vega**

59.     Plaintiff Franco Vega subscribed to LifeLock to protect his credit while he tried to build good credit.

60     Based on LifeLock's advertisements and representations, Mr. Vega reasonably believed that LifeLock would, among other things, cover any type of loss related to the theft of his identity.

61.     Mr. Vega also understood, based on LifeLock's advertisements and representations, that LifeLock would require entities extending credit to contact him to verify his identity prior to extending new credit to those purporting to be him.  In accordance with this understanding, Mr. Vega submitted his personal information to LifeLock, including numbers at which he was to be reached in the event of an attempted identity theft.

62.     While a LifeLock customer, an automobile dealership ran a credit report on Mr. Vega without his permission.  Mr. Vega never received a call from LifeLock regarding the report.

63.     Mr. Vega was not aware that LifeLock was not permitted to submit fraud alerts on his behalf and LifeLock did not advise him of this fact.

**D.     Melvyn and Alva Blake**

64.     Plaintiffs Melvyn and Alva Blake, a married couple, subscribed to LifeLock on or about September, 2008.

65.     Since subscribing to LifeLock, Melvyn and Alva have paid LifeLock twenty dollars per month for every month of service.

66.     Based on LifeLock's advertisements and representations, Melvyn and Alva reasonably believed that LifeLock would, among other things, cover any type of loss related to the theft of their identity.

67.     Melvyn and Alva also understood, based on LifeLock's advertisements and representations, that LifeLock would require entities extending credit to contact them to verify their identity prior to extending new credit.  In accordance with this understanding,

15

they submitted their personal information to LifeLock, including numbers at which they were to be reached in the event of an attempted identity theft.

68.     Melvyn and Alva were not aware that LifeLock was not permitted to submit fraud alerts on their behalves and LifeLock did not advise them of this fact.

## VII.   LIFELOCK CONTINUES TO HARM CONSUMERS

69.     Upon information and belief, Experian (one of three credit reporting agencies authorized to place fraud alerts in a consumer's credit file, and the primary entity LifeLock relied upon in placing fraud alerts until litigation commenced between the two entities) stopped accepting and renewing requests to place fraud alerts it received from LifeLock on or about the time Experian commenced its lawsuit against LifeLock – approximately February 13, 2008.  As a result, certain LifeLock customers did not have fraud alerts placed on their accounts despite the fact that they paid a monthly fee to LifeLock for its services.

70.     Upon further information and belief, LifeLock knew or should have known that Experian was not accepting fraud alerts.

71.     LifeLock continues to accept monthly fees for the placement of fraud alerts despite the fact that a federal court has ruled that such actions violate public policy.

72.     Additionally, LifeLock's CEO, Todd Davis, has made public statement that customers should ignore the "fine print" in the contracts limiting the $1 million guarantee because LifeLock will still do what it promises despite the contractual language limiting LifeLock's legal obligations.

73.     This case is not subject to arbitration because no lawful contract exists between LifeLock and putative Class Members, including Plaintiffs.  Additionally, the arbitration clause in the Terms and Conditions of LifeLock's form agreement is substantively and procedurally unconscionable, violates public policy and exceeds the reasonable expectations of the parties.  Furthermore, Defendant knew or should have known that the arbitration clause would have exceeded Plaintiffs' reasonable expectations.

1921303.1

## VIII.   COMMON COURSE OF CONDUCT EMANATING FROM ARIZONA

74.     Plaintiffs' agreements with LifeLock, as described below, are substantively analogous to all other agreements entered into by LifeLock and putative class members.

75.     Upon information and belief, all such agreements contain a clause stating that the all disputes arising out of or related to the agreement is governed by Arizona law. The clause states,

> Governing Law:  This agreement and any Service provided hereunder will be governed by the laws of the state of Arizona, without regard to any Arizona laws that would direct the choice of another state's laws and, where applicable, to be governed by the federal laws of the United States.  Subject to paragraph 12…, you irrevocably and unconditionally consent to submit to the excusive jurisdiction of the federal or state courts in the state of Arizona for any dispute or litigation arising out of, or relating to, the use or purchase of any Service from LifeLock, and waive any objection to the laying of venue of any such litigation in Arizona courts and agree not to claim that such litigation brought therein has been brought in an inconvenient forum.  In other words, if we have a dispute that results in a lawsuit, you agree to resolve it in an Arizona court.

76.     LifeLock requires all applicants to litigate all disputes in Arizona courts, and requires that Arizona law apply to such suits.  Furthermore, the agreement, to include the choice of law clause requiring adjudication of disputes in Arizona and subject to Arizona law, was created, adopted, ratified, implemented, and administered at its corporate headquarters in Tempe, Arizona, and is a contract of adhesion.

77.     Upon information and belief, LifeLock created, adopted, ratified, implemented, and/or administered a common course of conduct whereby it created an advertising scheme to unlawfully induce consumers into purchasing LifeLock through the use of false and misleading statements, and material omissions.

78.     LifeLock's unlawful scheme to mislead consumers across the country was created, adopted, ratified, and implemented, upon information and belief, at its corporate headquarters in Tempe, Arizona.  Accordingly, all actions that give rise to this complaint

17

1921303.1

emanate from Tempe, Arizona, to include LifeLock's pattern and practice of deceptive behavior.

79.    A resolution of LifeLock's liability to Plaintiffs will resolve the issue for all other putative class members.

## IX.    CLASS ACTION ALLEGATIONS

80.    Plaintiffs bring this action against LifeLock as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and 23(b)(3).  This action may properly be maintained as a class action because it satisfies the numerosity, typicality, adequacy, predominance and superiority requirements of Rule 23.

81.    The proposed "Class" is defined to be:  all persons in the United States who are current or past subscribers of LifeLock's identity theft protection services.  Excluded from the Class are current residents of Maryland and West Virginia; employees, officers or directors of Defendant; any judge or employee of the Court assigned to work on this lawsuit; and Plaintiffs' attorneys and staff.

82.    The requirements of subparts 23(a), (b)(2) and (b)(3) are met as follows:

### A.    Numerosity

83.    Although the exact size of the class is unknown, Plaintiffs believe, and all available information indicates, that the class numbers in the hundreds of thousands. According to news reports and other public documents, LifeLock has added new members at rates as high as several thousand a day, and has a total membership of approximately one million subscribers.  Given these numbers, numerosity is clearly satisfied.

### B.    Commonality

84.    There are numerous questions of law and fact common to the class, including, but not limited to:

    a. Whether LifeLock can lawfully place fraud alerts on behalf of consumers;

    b. Whether LifeLock's statement that it can legally place fraud alerts on behalf of its members is false, misleading, or deceptive;

18

c. Whether LifeLock's statement that it can legally place fraud alerts violates public policy;

d. Whether LifeLock's statement that it can perpetually renew fraud alerts is false or misleading;

e. Whether LifeLock's statements about the value and scope of its $1,000,000.00 Service Guarantee are false, misleading, or deceptive;

f. Whether the services offered by LifeLock and purchased by members of the Class create a valid contract even though the primary service LifeLock offers, the placement of fraud alerts, violates public policy because it is not permitted by federal law;

g. Whether LifeLock's activities breached the contract it formed with its members;

h. Whether the Service Guarantee provided by LifeLock is properly construed as a contract of insurance; and

i. Whether Arizona law governs all claims against LifeLock.

**C.     Typicality**

85.     Plaintiffs' claims are typical of the claims of the class as a whole.  Plaintiffs have the same interests in this matter as all other members of the class, and their claims are typical of all members of the class.  The claims were surrounded by the same representations and advertisements about product attributes and performance, which were, by design, uniform.  Moreover, the agreements entered into by Plaintiffs and Class Members are, upon information and belief, identical in material respects.  Furthermore, Plaintiffs and all class members have sustained damages arising out of LifeLock's common course of conduct as outlined above, in the same manner and arising out of the same misconduct.

**D.     Adequacy**

86.     Plaintiffs will fairly and adequately protect the interests of the class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the remainder

1921303.1

of the class.  Plaintiffs are committed to pursuing the action and have obtained counsel

experienced and qualified to prosecute this action and class actions generally.

**E.     Common Questions Predominate and the Class Action Device is Superior**

87.     Prosecution as a class action will eliminate the possibility of repetitious

litigation, while also providing redress of claims too small to support the expense of

individual claims.

88.     Class treatment is also appropriate because LifeLock has acted uniformly

with respect to all class members.

89.     Further, the questions of law and fact common to the members of the class

predominate over any questions affecting any individual member, and a class action is

superior to other available methods for the fair and efficient adjudication of the

controversy between Plaintiffs and LifeLock.

90.     Joinder of all class members who are geographically dispersed and number,

upon information and belief, in the hundreds of thousands is impracticable.  Furthermore,

the expense and burden of individual litigation makes it impractical to redress the wrong

done to them on an individual-by-individual claim basis.

**X.     CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(Violation of the Arizona Consumer Fraud Act)**

91.     Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

92.     LifeLock's advertising and website made use of deception, false promises,

misrepresentations and material omissions in connection with the sale and advertisement

of its services, in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-

1522(A).

93.     LifeLock used false, deceptive and misleading statements, and omitted

material facts, concerning the scope of its alleged $1 million guarantee.  LifeLock,

through its advertising, informed and led consumers to believe that the guarantee would

1921303.1

cover all losses resulting from any identity theft experienced by a member of LifeLock, when in reality the guarantee will not cover any losses experienced by a member. Instead, it will only provide coverage when the consumer can prove that the theft occurred as a result of LifeLock's failure to provide the promised service, and consists, at most, of hiring professionals to attempt to restore losses rather than covering the losses themselves, and even then only if those expenses are related to a defect in the service itself.

94.     LifeLock's guarantee purposely used inconsistent and confusing terms within its Terms and Conditions and Service Guarantee so as to confuse consumers, provide LifeLock with a basis to deny claims from members who experience identity theft, and deter members from bringing legitimate claims.

95.     LifeLock also used false, deceptive and misleading statements, and omitted material facts, concerning the availability, purpose and scope of fraud alerts; LifeLock's ability to place such alerts under the FCRA; and the ramifications of such alerts on the consumer's credit score, creditworthiness, credit report, credit file, and ability to secure credit.  For example, LifeLock omits from its advertising the fact that corporations such as LifeLock are not authorized to place fraud alerts on behalf of consumers under the FCRA.  LifeLock also fails to disclose in its advertising that consumers are only entitled to place and renew fraud alerts when they have a good faith belief that they are or are about to be the victim of fraudulent activity, burying a statement that each member has such a belief in the Terms and Conditions of the agreement.  In addition, LifeLock tells consumers that fraud alerts will not affect their credit worthiness or ability to secure credit, when in fact they may.

96.     Likewise, LifeLock's advertisements and promotions were misleading, false and deceptive, and contained material omissions, regarding the efficacy of LifeLock's services.  For example, the FCRA does not require merchants to call the consumer before extending credit when a fraud alert is in place, as LifeLock states it does.  Fraud alerts also do not protect against many forms of identity theft which do not involve opening

1921303.1

new accounts or accessing credit reports.  In addition, LifeLock's claim that it will hire "the best lawyers" to protect a consumer's good name in the event of identity theft is false and misleading in that LifeLock reserves sole discretion to choose all professionals and does not, upon information and belief, hire the best attorneys available to restore losses resulting from identity theft.

97.     LifeLock's advertisements featuring Todd Davis giving out his real social security number as a way to prove that LifeLock's service is effective, including the statements that he has complete confidence in LifeLock's protections and that "LifeLock helps keep your personal information safe, even in the wrong hands," were false and misleading, and contained material omissions, given that Davis' identity was stolen.

98.     As a result of LifeLock's misrepresentations and false statements, LifeLock's members enrolled with LifeLock and paid LifeLock's fees.

99.     LifeLock's members were injured by LifeLock's false promises and misrepresentations, and sustained damages in an amount to be proven at trial.  These damages consist, at a minimum, of paying monthly charges for services that were not as represented, paying for insurance that was sold illegally and was not rate regulated, paying for a service that is illegal for a company such as LifeLock to perform, and having their creditworthiness or credit adversely affected because of Defendant's services.

**SECOND CAUSE OF ACTION**
**(False and Misleading Advertising of an Insurance Product)**

100.    Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

101.    Through its website and advertising, LifeLock represented to all consumers that it could protect the identity of its members and that it would guarantee its services up to $1 million.  However, the actual coverage provided under the terms of the policy is dramatically less than what LifeLock represents in its advertisements.

102.    Although LifeLock intentionally used inconsistent and misleading terms in its agreements and stated that it disclaimed all consequential damages and would pay only to cure a defect in its service, the language of the Service Guarantee as properly

1921303.1

construed under the laws of Arizona requires LifeLock to provide coverage beyond curing a defect in its service, and constitutes insurance.  By promising to pay professionals to restore losses associated with an identity theft resulting from a failure or defect in its service, LifeLock assumes the risk of such losses, distributes such losses among all its members, and finances this scheme out of the fees paid by members.

103.    In advertising its services and its Service Guarantee, LifeLock made, issued, circulated and caused to be repeated statements that misrepresented the terms of the policy of insurance.  LifeLock stated in its advertising that its Service Guarantee would cover all losses and all expenses up to $1 million any time a member's identity was stolen.  However, in reality, LifeLock will not pay for any losses or damages experienced by a member who is a victim of identity theft under any circumstances.  The only protection actually provided under the policy is that LifeLock will pay other professionals to attempt to restore such losses, but even then, only when the consumer can prove that the theft and the loss resulted from a failure or defect in LifeLock's service, not anytime their identity is stolen, as LifeLock advertises.

104.    In addition, LifeLock fails to disclose that its insurance policy is not sold by licensed agents or regulated by the Department of Insurance as required by law.

105.    LifeLock's misleading and false statements violate Ariz. Rev. Stat. § 20-443(1), which forbids making, issuing, circulating, or causing to be made, issued or circulated any statements "misrepresenting the terms of any policy issued."

106.    As a result of the aforementioned conduct, LifeLock's members were injured by LifeLock's false promises and misrepresentations concerning the terms of its insurance, and sustained damages to be more fully proven at trial, including but not limited to all fees paid to LifeLock for its alleged services.

### THIRD CAUSE OF ACTION
### (Declaratory Relief)

107.    Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

1921303.1

108.    Through its website, advertising, and the terms and conditions of its agreement with members, LifeLock offered to protect the identity of its members by, among other things, placing and renewing 90-day fraud alerts on members' credit reports, and providing a $1 million Service Guarantee.

109.    Plaintiffs and class members accepted that offer and provided consideration through enrollment and payment of the fee.

110.    LifeLock, therefore, formed contracts with Plaintiffs and all class members.

111.    However, LifeLock could not fulfill its promise under the contract without violating the FCRA, as it is not authorized to place fraud alerts, and did not adequately ascertain whether its members have the necessary good faith belief that is required to qualify for a fraud alert (*i.e.*, that members are or are about to be victims of fraud or identity theft).

112.    Because LifeLock's promises required it to violate federal law, the object of the contract was illegal, and Plaintiffs and all class members are entitled to have the contract rescinded and to have all fees refunded.

113.    LifeLock's promises and actions also violated public policy, and therefore the contract is null and void and must be rescinded and all fees paid must be refunded to Plaintiffs and class members.

114.    In addition, LifeLock made material misrepresentations about the agreement and its services.  LifeLock misrepresented to consumers that (1) it could lawfully place fraud alerts on their behalf, even though it could not under the terms of the FCRA, (2) all consumers are entitled to place and renew such fraud alerts, without informing consumers that they must have a good faith belief that they are about to be the victim of fraudulent activity, (3) the fraud alerts would protect them from identity theft and that all creditors would be required to call the consumer before providing credit, even though that is not accurate, (4) the perpetual renewal of such fraud alerts would have no effect on their creditworthiness, credit score, or ability to secure credit, even though that is not the case, and (5) LifeLock would guarantee consumers for up to $1 million against any losses or

any expenses resulting from an identity theft, when in fact LifeLock will not pay for any losses.

115.    LifeLock's statements were standardized material misrepresentations about the nature and terms of the contract, which induced Plaintiffs and class members to enter into the contract and become members of LifeLock.

116.    For these reasons, the LifeLock contract is void and unenforceable *ab initio,* and should be declared as such under the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*

117.    Furthermore, Plaintiffs and class members are entitled to rescission of the contracts, and are entitled to have all monies paid to LifeLock refunded pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq* .

118.    Plaintiffs and all class members sustained damages as a result of LifeLock's illegal actions related to the contract, including but not limited to, all fees paid to LifeLock.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**

119.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

120.    As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, LifeLock has profited and benefited from the unlawful sale of its protection scheme and collection of monthly subscription fees from Plaintiffs and the Class.

121.    LifeLock's contract with Plaintiffs and the Class Members is *void ab initio* because the object and purpose of the contract – LifeLock's placement of fraud alerts – is illegal.  As a result, no lawful contract ever existed between LifeLock and any member of the Class, including Plaintiffs.

1921303.1

122.    LifeLock has voluntarily accepted and retained these fees with full knowledge and awareness that, as a result of their deception, Plaintiffs and the members of Class paid substantial monies to LifeLock to which it was not lawfully entitled.

123.    LifeLock has been unjustly enriched at the expense of Plaintiffs and Class members, who are entitled to in equity, and hereby seek, the disgorgement and restitution of LifeLock's wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy LifeLock's unjust enrichment.

### FIFTH CAUSE OF ACTION
#### (Breach of Contract)

124.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

125.    If the court finds that the contracts are not void *ab initio*, Plaintiffs respectfully allege the following breach of contract claim under Arizona Law on behalf of the Class.

126.    Through its website, advertising, and the terms and conditions of its agreements with members, LifeLock offered to protect the identity of its members by, among other things, placing and renewing 90-day fraud alerts on members' credit reports with all three credit reporting bureaus, and providing a $1 million Service Guarantee.

127.    Plaintiffs and class members accepted that offer and provided consideration through enrollment and payment of the fee.

128.    LifeLock, therefore, formed contracts with Plaintiffs and all class members.

129.    Additionally, the contractual agreements between class members and LifeLock are form contracts of adhesion, and the material terms of each and every contract is, upon information and belief, analogous.

1921303.1

130.    Upon further information and belief, all such contracts contain a clause stating "…that all disputes arising out of or related to this agreement is governed by Arizona law."  Accordingly, class-wide application of Arizona law is proper.

131.    LifeLock breached the contract and the covenant of good faith and fair dealing by, including but not limited to:

- Placing fraud alerts in violation of federal law and public policy.

- Failing to seek and obtain information from class members that would enable it to at least partially comply with federal law (*i.e.*, information sufficient to form a good-faith belief that members are or are about to be victims of fraud or identity theft).

- Making material misrepresentations about the agreement and its services. LifeLock misrepresented to consumers that (1) it could lawfully place fraud alerts on their behalf, even though it could not under the terms of the FCRA, (2) all consumers are entitled to place and renew such fraud alerts, without informing consumers that they must have a good faith belief that they are about to be the victim of fraudulent activity (3) the fraud alerts would protect them from identity theft and that all creditors would be required to call the consumer before providing credit, even though that is not accurate, (4) the perpetual renewal of such fraud alerts would have no effect on their creditworthiness, credit score, or ability to secure credit, even though that is not the case, and (5) LifeLock would guarantee consumers for up to $1 million against any losses or any expenses resulting from an identity theft, when in fact LifeLock will not pay for any losses.

- Failing to disclose that it would be required to, directly or indirectly, violate federal law in order to comply with the contract.

- Failing to disclose that its conduct was contrary to federal law and one or more credit bureau was objecting to its conduct.

- Failing to disclose that it was prohibited by law from providing the coverage promised in advertisements.

132.    Plaintiffs and class members could not reasonably be expected to know that LifeLock's actions violate federal law or that LifeLock failed to seek and obtain information required under federal law.

1921303.1

133.   For these reasons, LifeLock breached the contract by not truthfully, completely, and accurately disclosing material information regarding the contract, and by performing services, unbeknownst to Plaintiffs and Class Members, that violate federal law and public policy.

134.   Plaintiffs and all class members sustained damages and continue to suffer damage as a result of LifeLock's conduct in an amount to be proven at trial.

## XI.   ALTERNATIVE CAUSES OF ACTION

### A.   Consumer Fraud

135.   Class-wide application of Arizona law is proper.  But in the event that this court finds that class-wide application of Arizona law is not appropriate, Plaintiffs respectfully reserve the right to allege alternative causes of actions based on specific state consumer protection laws, common law, and state-law statutory claims applicable to the Class.   Such claims, however, are unnecessary at this juncture since presumptively the parties' choice of law provision indicates that that class-wide application of Arizona law is proper.

### B.   Breach Of Contract

136.   Once again, class-wide application of Arizona law is proper.  But in the event that the Court finds that the class-wide application of Arizona contract law is not appropriate, Plaintiffs respectfully reserve the right to allege alternative causes of action based on specific state contract laws applicable to the Class.  Such claims, however, are unnecessary at this juncture since presumptively the parties' choice of law provision indicates that that class-wide application of Arizona law is proper.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of himself and the Class, pray for judgment against Defendant and that, as part of that judgment, the Court:

A.   Certify this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3);

B.   Award Plaintiffs and each class member appropriate damages**;**

28

C.      Declare that all contracts are rescinded and order that all monies paid to Defendant be returned to the class because Defendant procured the contracts in violation of state and federal law;

D.      Award pre- and post-judgment interest to Plaintiffs and class members;

E.      Award Plaintiffs the costs of bringing this action and reasonable attorneys' fees;

F.      Award Plaintiffs and class members exemplary damages as are appropriate to deter and punish such acts;

G.      Order that Defendant be enjoined from collecting insurance premiums in violation of Arizona law and engaging in unfair and/or deceptive acts or practices as set forth in this complaint; and

H.      Such other relief as the Court deems just and proper.



RESPECTFULLY SUBMITTED this 31st day of July, 2009.

HAGENS BERMAN SOBOL SHAPIRO LLP


By   s/ Leonard Aragon
        Robert B. Carey
        Leonard Aragon
        2425 East Camelback Road, Suite 650
        Phoenix, Arizona 85016

        Steve W. Berman
        HAGENS BERMAN SOBOL SHAPIRO LLP
        1301 Fifth Avenue, Suite 2900
        Seattle, Washington 98101

        Interim Lead Class Counsel for Consolidated Plaintiffs

1921303.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

J. Grant Woods
GRANT WOODS, P.C.
1726 North Seventh Street
Phoenix, Arizona 85006
Telephone: (602) 258-2599
Facsimile: (602) 258-5070
E-Mail: gw@grantwoodspc.net
Interim Lead Class Counsel for
Consolidated Plaintiffs

Laurence D. King
Christine M. Fox
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, California 94104
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
E-Mail: lking@kaplanfox.com
          cfox@kaplanfox.com
Counsel for Plaintiff Sbalcio

Thomas Zimmerman, Jr.
ZIMMERMAN LAW OFFICES, P.C.
100 West Monroe Street, Suite 1300
Chicago, Illinois 60603
Telephone: (312) 440-0020
E-Mail: tom@attorneyzim.com
Counsel for Plaintiff Aliano

Edward H. Britt
Ryan Skiver
BRITT LAW OFFICES
2525 East Camelback Road, Suite 900
Phoenix, Arizona 85016
Telephone: (602) 258-7474
Facsimile: (602) 258-7479
E-Mail: ebritt@brittlawgroup.com
          rskiver@brittlawgroup.com
Counsel for Plaintiff Berland

1921303.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Simon Paris
Patrick Howard
SALTZ, MONGELUZZI, BARRETT &
    BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 575-3895
Facsimile: (215) 575-3894
E-Mail: sparis@smbb.com
            phoward@smbb.com
Counsel for Plaintiffs Blake

Stuart M. Paynter
THE PAYNTER LAW FIRM PLLC
1200 G. Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
E-Mail: Stuart@smplegal.com

William F. Murphy
DILLINGHAM & MURPHY, LLP
225 Bush Street, 6th Floor
San Francisco, CA 94104
Telephone: (415) 397-2800
Facsimile: (415) 397-3300
E-Mail: wfm@wirepaladin.com
Counsel for Plaintiff Vega

Jonathan Shub
Seeger Weiss LLP
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: (215) 564-2300
Facsimile: (215) 851-8029
E-Mail: jshub@seegerweiss.com

George K. Lang
FREED & WEISS LLC
111 West Washington Street, Suite 1331
Chicago, Illinois 60602
Telephone: (312) 220-0000
E-Mail: george@freedweiss.com
Counsel for Plaintiff Kondrat

1921303.1

1

2                           Leif Garrison
NORTON FRICKEY, P.C.

3                           2301 East Pikes Peak Avenue
Colorado Springs, CO 80909

4                           Telephone: (719) 635-7131
Facsimile: (719) 635-2920

5                           E-Mail: lgarrison@earthlaw.com
Counsel for Plaintiff Lackey

6

7                           David Paris
PARIS ACKERMAN & SCHMIERER, LLP

8                           103 Eisenhower Parkway
Roseland, New Jersey 07068

9                           Telephone: (973) 228-6667
Facsimile: (973) 629-1246

10                         E-Mail: david@paslawfirm.com

11                         Counsel for Plaintiffs Dillon, Ly, Martinez-
Azoy and Pasternack

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATION OF SERVICE**

I hereby certify that on July 31, 2009, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant(s):

Peter A Antonucci, antonuccip@gtlaw.com, kormanikm@gtlaw.com

TerriAnne Benedetto, tbenedetto@seegerweiss.com

Steve W Berman, steve@hbsslaw.com, heatherw@hbsslaw.com

Nina Boyajian, boyajian@gtlaw.com

Edward Henry Britt, EBritt@BrittLawGroup.com, SPintel@BrittLawGroup.com

Kristine Kunkel Campbell, campbellk@gtlaw.com, fischerc@gtlaw.com, mackeym@gtlaw.com

Robert B Carey, rcarey@hbsslaw.com, amyn@hbsslaw.com, cindyj@hbsslaw.com

Leif Garrison, lgarrison@earthlaw.com, gbeck@earthlaw.com

Christine Marie Fox, cfox@kaplanfox.com

Jordan D Grotzinger, grotzingerj@gtlaw.com, SolorzanoM@gtlaw.com

Patrick Howard, phoward@smbb.com, jrose@smbb.com, cdfonda@smbb.com

Roger B Kaplan, kaplanr@gtlaw.com

Laurence D King, lking@kaplanfox.com, agutierrez@kaplanfox.com

Justin M Klein, justin@marksklein.com, joanne@marksklein.com, karin@marksklein.com

George K Lang, george@freedweiss.com, ecf@freedweiss.com, sherrie@freedweiss.com

William F Murphy, wfm@wirepaladin.com, slm@dillinghammurphy.com

Charlene Lee Oh, OhC@gtlaw.com, beattyc@gtlaw.com

Pamela M Overton, overtonp@gtlaw.com, mowent@gtlaw.com

David S Paris, david@paslawfirm.com

Simon Bahne Paris, sparis@smbb.com, jrose@smbb.com, cdfonda@smbb.com

Stuart McKinley Paynter, stuart@smplegal.com

33

Jonathan Shub jshub@seegerweiss.com

Ryan Christopher Skiver, rskiver@brittlawgroup.com

Joel Grant Woods, gw@grantwoodspc.net, sharonb@grantwoodspc.net

Thomas A Zimmerman, Jr., tom@attorneyzim.com


s/ Amy Nolan

1921303.1